IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. THOMAS AND ST. JOHN

MARK KRAGEL                                      )
                                                 )
                    Plaintiff,                   )
                                                 )
        vs.                                      )        CIVIL NO. 2021-78
                                                 )
VIRGIN ISLANDS WATER &                           )
POWER AUTHORITY, LAWRENCE                         )
KUPFER, and ANTHONY THOMAS,                      )
                                                 )
                    Defendants.                  )
_____        )

## MEMORANDUM OPINION AND ORDER

Before the Court is plaintiff Mark Kragel's Motion to Disqualify defense counsel, Simone

Francis.   [ECF 78].   Defendants Virgin Islands Water and Power Authority ("WAPA"),

Lawrence Kupfer, and Anthony Thomas (collectively, "defendants") oppose the motion.   [ECF

98].   Plaintiff filed a reply, [ECF 101], and this matter is now ripe for decision.

## I.       BACKGROUND

Plaintiff has sued defendants for violation of his First Amendment rights, claiming that

defendants unlawfully terminated his employment as WAPA's Deputy Legal Counsel because of

his Facebook comment criticizing the Black Lives Matter movement.   Am. Compl. [ECF 90] at

26–32.   WAPA employed plaintiff in the Office of the General Counsel from 2009 or 2010 until

2015.   *Id.* ¶ 14; [ECF 11] ¶ 10.   He then returned to work in the Office of the General Counsel in

2019 until his termination in June 2020.   [ECF 90] ¶¶ 15, 70, 88, 108; [ECF 11] ¶ 11.   At the

time of the events underlying plaintiff's claims, defendant Thomas served as WAPA's Chairman

of the Board, and defendant Kupfer served as WAPA's Executive Director and CEO.   [ECF 90]

¶¶ 3–4; [ECF 11] ¶¶ 3–4.   Attorney Simone Francis represents all three defendants.   *See* [ECFs

9, 10, 29].

Attorney Francis also represents WAPA in a 2015 lawsuit filed by another former WAPA

employee, Kenval Thomas, in which Kragel is also a defendant.   [ECF 78] at 2; [ECF 81] at 1.

In the Thomas case, WAPA, Kragel (appearing *pro se*), and a third defendant (BoltNagi, P.C.) entered into a Joint Defense and Confidentiality Agreement (the "Agreement" or "JDA"). *Id.*[1] Kragel avers that "[e]ach attorney was part of an on-going and joint effort to set up a common defense strategy[,]" including discussing "the motions that needed to be pursued and the timeline to do so[,]" and "their written responses to discovery before they were produced to the opponent." [ECF 78] at 2. Kragel further contends that Attorney Francis "serves as the *de facto* lead counsel in the Thomas case." *Id.* at 2–3. "For example, in WAPA's discovery responses, Francis objected on behalf of WAPA, Mark Kragel and Bolt Nagi." *Id.* at 3. "Only [Attorney] Francis, on behalf of WAPA, served written discovery on Kenval Thomas." *Id.* While the defendants jointly discussed the approach and strategy for Thomas's deposition, Attorney Francis was "driving the bus." *Id.* In addition, the defendants collaborated on mediation strategy. *Id.* Kragel thus contends that "[t]hroughout the defense of the Thomas case, all attorneys were privy to confidential work product and privileged information." *Id.*

Kragel filed the instant action on October 25, 2021. Ver. Compl. [ECF 1]. On December 22, 2021, Attorney Francis entered an appearance and filed answers on behalf of defendants WAPA and Thomas. [ECFs 9, 10, 11, 12]. On March 1, 2022, Attorney Francis entered an appearance and filed an answer on defendant Kupfer's behalf. [ECFs 29, 30].

---

[1] According to Kragel's counsel Attorney Terri Griffiths, she asked Attorney Francis at the beginning of this lawsuit whether she represented Kragel in the Thomas matter, or if there was any defense agreement, and Attorney Francis denied the same. [ECF 78] at 3. Attorney Francis disputes this as false. [ECF 98] at 18. According to Attorney Francis, "mid-way through a February 22, 2022 meet and confer about a Rule 16 submission, Plaintiff's counsel suddenly asserted that [Attorney Francis] had a conflict because she 'represented' Mark Kragel, and then went on to refer to a [JDA] that had been reached in the Superior Court Lawsuit as the basis for that assertion." *Id.* Attorney Francis thus claims "[t]here was no denial of the existence of a [JDA], as Plaintiff's counsel clearly indicated her awareness of the Agreement." *Id.* Rather, Attorney Francis's "only response was that WAPA could withdraw from the [JDA], to which Plaintiff's counsel stated that counsel did not get to 'choose clients.'" *Id.*

Plaintiff avers that he was devastated after he was fired and could not recall whether he signed an agreement, but he trusted Attorney Francis's recollection. [ECF 78] at 3; [ECF 78-3] at 2. Sometime after the mediation in this case, Attorney Griffiths directed him to contact BoltNagi, his former employer and codefendant in the Thomas case, to inquire about a JDA. [ECF 78] at 4. BoltNagi then provided a signed copy of the JDA. *Id.*

The parties participated in mediation on August 19, 2022.   [ECF 78] at 3.   According to Kragel, "[t]hat same day, within approximately ten (10) minutes from the start of the mediation, Kenval Thomas' attorney sent an email for proposed dates with respect to an amended scheduling order in a case that has been dormant since 2018."   *Id.* at 3–4.   Kragel contends that "the simultaneous resurrection of the Thomas case on the morning of the mediation in the instant case was used as an improper settlement tactic."   *Id.* at 4.   He does not, however, further elaborate on this claim.

On September 8, 2022, Kragel moved to disqualify Attorney Francis based on an alleged conflict of interest arising under the JDA in the Thomas case.   [ECF 78] at 1.   Specifically, Kragel contends that Attorney Francis possesses his confidential information obtained pursuant to the JDA, that the parties agreed to hold such information in strict confidence, and that the parties are bound by the JDA after conclusion of the Thomas case.   *Id.*   Thus, "[t]here is a direct adverse conflict of interest by virtue of [Attorney Francis's] position as *de facto* lead counsel and the [JDA] in the Thomas matter and her simultaneous appearance in the instant case."   *Id.* at 5.   Kragel further avers that disqualification is not sought to gain a tactical advantage, but to avoid a tactical disadvantage.   *Id.* at 18.   In addition, disqualification will not result in "additional or duplicative hearings, trials, or other court time" because this matter is still in its infancy.   *Id.*   Finally, Kragel contends that if Attorney Francis voluntarily withdrew from the Thomas case, it would not solve the conflict of interest in this case, and would run afoul of her fiduciary duties and the contractual and ethical duties of confidentiality arising under the JDA.   *Id.*

Defendants characterize plaintiff's motion as "a desperate attempt to manufacture a sideshow that might detract attention from the absolute lack of merit of his claims" that is "based upon the false assertion that counsel for WAPA also represents Kragel in [the Thomas case]." [ECF 98] at 1.   According to defendants, the motion "is premised upon the purported existence of

an attorney-client relationship between Kragel and Ogletree Deakins . . . [but] no such relationship exists." *Id.* at 5. Defendants further contend that the claims at issue in this case are not substantially related to the claims in the Thomas case; "[t]herefore, there is no credible cause for concern that Ogletree Deakins' continued representation of WAPA will 'taint' this litigation or prejudice Kragel." *Id.* at 15. Additionally, defendants argue Kragel waived his right to seek disqualification due to the length of time Kragel delayed in bringing the motion. *Id.* at 17. Finally, defendants contend disqualification at this juncture would be unduly prejudicial. *Id.* at 20.

## II.    LEGAL STANDARDS

"The district court's power to disqualify an attorney derives from its inherent authority to supervise the professional conduct of attorneys appearing before it." *United States v. Miller*, 624 F.2d 1198, 1201 (3d Cir. 1980). "The underlying principle in considering motions to disqualify counsel is safeguarding the integrity of the court proceedings [and] the purpose of granting such motions is to eliminate the threat that the litigation will be tainted." *Lamb v. Pralex Corp.*, 333 F. Supp. 2d 361, 363 (D.V.I. 2004). "The maintenance of public confidence in the propriety of the conduct of those associated with the administration of justice is so important a consideration that [the Third Circuit] ha[s] held that a court may disqualify an attorney for failing to avoid even the appearance of impropriety." *Denero v. Palm Horizons Mgmt., Inc.*, 2015 WL 5012126, at *3 (D.V.I. Aug. 21, 2015) (alterations in original) (citation omitted).

In the District Court of the Virgin Islands, the ABA Model Rules of Professional Conduct ("MRPC") govern the professional responsibilities of practicing attorneys. *See* LRCi 83.2(a)(1); *VECC, Inc. v. Bank of Nova Scotia*, 222 F. Supp. 2d 717, 719 (D.V.I. 2002). Model Rule 1.6 governs confidentiality of information. This rule prohibits a lawyer from "reveal[ing] information relating to the representation of a client unless the client gives informed consent, the

*Mark Kragel v. VI Water & Power Authority, et al.*,
Civil No. 2021-78
Page 5

disclosure is impliedly authorized in order to carry out the representation," or the disclosure is

otherwise permitted by circumstances inapplicable to the present matter.   MRPC 1.6(a).   The rule

further imposes an obligation on lawyers to "make reasonable efforts to prevent the inadvertent or

unauthorized disclosure of, or unauthorized access to, information relating to the representation of

a client."   MRPC 1.6(c).

Model Rule 1.7 concerns conflicts that arise because of duties owed to current clients, and

prohibits representation of a client where there is a "concurrent conflict of interest."

> A concurrent conflict of interest exists if:
>
> (1) the representation of one client will be directly adverse to another client; or
>
> (2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.

MRPC 1.7(a).   "Direct adversity requires a conflict as to the legal rights and duties of the clients,

not merely conflicting economic interests."   ABA Comm. on Ethics & Pro. Resp., Formal Op. 05-

434 (2004).   To determine material limitation under the second prong, "the critical consideration

is the likelihood that a difference in the attorney's and client's interests will occur, and, if it does,

whether the difference will significantly interfere with the attorney's independent professional

judgment or prevent courses of action that reasonably should be pursued on the client's behalf."

*Todman v. Johnson*, 2022 WL 3722457, *4 (V.I. Super. Ct. June 9, 2022).[2]   The Rule further

provides that, notwithstanding the existence of a concurrent conflict of interest, a lawyer may

represent a client if:

> (1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;

---

[2] *Todman* discusses the Virgin Islands Rules of Professional Conduct, which "are substantively identical to the ABA rules."   2022 WL 3722457, at *3 n.25; *compare* V.I. S. Ct. R. 211.1.7, *with* MRPC 1.7.

(2) the representation is not prohibited by law;

(3) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal; and

(4) each affected client gives informed consent, confirmed in writing.

MRPC 1.7(b).

Finally, Model Rule 1.9 addresses conflicts of interest stemming from representation of former clients, and provides in pertinent part:

A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing.

MRPC 1.9(a).   "Matters are 'substantially related' . . . if they involve the same transaction or legal dispute or if there otherwise is a substantial risk that confidential factual information as would normally have been obtained in the prior representation would materially advance the client's position in the subsequent matter."   MRPC 1.9 cmt. 3.[3]   The following factors guide this Court's determination as to whether matters are substantially related: "(1) the nature and scope of the earlier representation; (2) the nature of the present lawsuit; and (3) the possibility that the client might have disclosed confidences during the earlier representation which could be relevant and detrimental to the present action."   *VECC, Inc.*, 222 F. Supp. 2d at 720.   "In answering the first question, the court should focus upon the reasons for the retention of counsel and the tasks which

---

[3] Similarly, the Restatement (Third) of the Law Governing Lawyers § 132 (2000) provides that matters are substantially related if:

(1) the current matter involves the work the lawyer performed for the former client; or

(2) there is a substantial risk that representation of the present client will involve the use of information acquired in the course of representing the former client, unless that information has become generally known.

the attorney was employed to perform." *Com. Ins. Co. v. Graphix Hot Line, Inc.*, 808 F. Supp. 1200, 1204 (E.D. Pa. 1992). "With respect to the second question, the court should evaluate the issues raised in the present litigation and the underlying facts." *Id.* Finally, in answering the third question, "courts should not read the word 'might' literally." *Id.* Rather, to determine whether "a lawyer might have acquired substantially related information in issue," the court should consider whether "(a) the lawyer and the client ought to have talked about particular facts during the course of the representation, or (b) the information is of such character that it would not have been unusual for it to have been discussed between lawyer and client during their relationship." *Id.* (internal quotations and citation omitted); *see also VECC*, 222 F. Supp. 2d at 721 ("a court need not delve into the exact nature of confidences revealed if it is merely possible, given the nature and scope of the current and former representation, that such confidences were revealed").

In considering a motion to disqualify, "[c]ourts are required to preserve a balance, delicate though it may be, between an individual's right to his own freely chosen counsel and the need to maintain the highest ethical standards of professional responsibility." *Lamb*, 333 F. Supp. 2d at 364) (internal quotations and citation omitted). Even if a court finds that counsel violated the MRPC, however, "disqualification is never automatic." *Brice v. Hess Oil Virgin Islands Corp.*, 769 F. Supp. 193, 195 (D.V.I. 1990) (quoting *Miller*, 624 F.2d at 1201). Rather, a "court should disqualify an attorney only when it determines, on the facts of the particular case, that disqualification is an appropriate means of enforcing the applicable disciplinary rule." *Id.* (quoting *Miller*, 624 F.2d at 1201); *see also Republic of Philippines v. Westinghouse Elec. Corp.*, 43 F.3d 65, 74 (3d Cir. 1994) ("a district court must ensure that there is an adequate factual predicate for flexing its substantial muscle under its inherent powers"). In making this determination, a court should balance the following factors: (1) the moving litigant's interest in "the continued loyalty of his attorney"; (2) "the opposing litigant's interest in retaining his chosen

counsel"; (3) prejudice to the opposing litigant in terms of "time and expense required to familiarize a new attorney with the matter"; and (4) "the policy that attorneys be free to practice without excessive restrictions." *Brice*, 769 F. Supp. at 195.

In addition, "[c]ourts have held that a party may waive its objection to a conflict of interest by failing to file timely a motion to disqualify." *Cubica Grp., LLLP v. Mapfre Puerto Rican Am. Ins. Co. (MAPFRE)*, 2012 WL 5331257, at *4 (D.V.I. Oct. 29, 2012); *Alexander v. Primerica Holdings, Inc.*, 822 F. Supp. 1099, 1115 (D.N.J. 1993) ("Waiver is a valid basis for the denial of a motion to disqualify.").

> In determining whether the moving party has waived its right to object to the opposing party's counsel, the following factors should be considered: "(1) the length of the delay in bringing the motion to disqualify, (2) when the movant learned of the conflict, (3) whether the movant was represented by counsel during the delay, (4) why the delay occurred and (5) whether disqualification would result in prejudice to the non-moving party."

*Cubica Grp.*, 2012 WL 5331257, at *4 (quoting *Alexander*, 822 F. Supp. at 1115).   "The essence of this analysis is whether the party seeking disqualification appears to use the disqualification motion as a tactical maneuver." *Rohm & Haas Co. v. Am. Cyanamid Co.*, 187 F. Supp. 2d 221, 229–30 (D.N.J. 2001); *see also Jackson v. J. C. Penney Co.*, 521 F. Supp. 1032, 1034–35 (N.D. Ga. 1981) ("A litigant may not delay filing a motion to disqualify in order to use the motion later as a tool to deprive his opponent of counsel of his choice after substantial preparation of the case has been completed.").

Finally, "[m]otions to disqualify are viewed with disfavor and disqualification is considered a drastic measure which courts should hesitate to impose except when absolutely necessary." *Alexander*, 822 F. Supp. at 1114 (internal quotations and citation omitted); *see also Hamilton v. Dowson Holding Co.*, 2009 WL 2026327, at *3 (D.V.I. July 2, 2009) ("Because disqualification is a severe remedy, the courts must adhere to an exacting standard when

considering motions to disqualify so as to discourage their uses as a dilatory tactic."), *aff'd*, 455 F. App'x 228 (3d Cir. 2011).   "Although doubts are to be resolved in favor of disqualification, the party seeking disqualification must carry a 'heavy burden' and must meet a 'high standard of proof' before a lawyer is disqualified."   *Alexander*, 822 F. Supp. at 1114 (citation omitted). "Vague and unsupported allegations are not sufficient to meet this standard."   *Cohen v. Oasin*, 844 F. Supp. 1065, 1067 (E.D. Pa. 1994).   "Thus, the burden is on the movant to establish with specificity a violation of one or more of the disciplinary rules, and mere allegations of unethical conduct or evidence showing a remote possibility of a violation of the disciplinary rules will not suffice . . . ."   *Hamilton*, 2009 WL 2026327, at *3.

## III.    DISCUSSION

Defendants characterize plaintiff's motion as premised on the claim that Attorney Francis represents Kragel in the Thomas case.[4]   Defendants argue that no such attorney-client relationship exists; therefore, MRPC 1.7 is inapplicable.   Plaintiff's argument, however, is more nuanced. The basis of Kragel's motion is that Attorney Francis obtained his confidential information pursuant to the JDA in the Thomas case, and her ability to use that information against Kragel in this case gives WAPA an unfair tactical advantage.   In support, plaintiff argues that the common interest doctrine extends the meaning of "attorney-client relationship" to create a duty of confidentiality owed to nonclient parties to JDAs such that the Rule 1.7 conflicts analysis applies here.

There is no dispute that (1) Attorney Francis does not formally represent Kragel in the Thomas case, and (2) Kragel has not consented to WAPA's representation by Attorney Francis in this matter.   Thus, to determine whether a disqualifying conflict of interest exists, the Court must

---

[4] This argument is a red herring.   Plaintiff does not claim that Attorney Francis represents him in the Thomas case, or that an attorney-client relationship exists under the plain terms of the JDA.

consider (1) whether the JDA gives rise to an implied attorney-client relationship, (2) whether Attorney Francis's representation of WAPA in this matter is directly or materially adverse to Kragel, (3) whether this matter is substantially related to the Thomas case, and (4) whether there is a significant risk that Attorney Francis's representation of WAPA will be materially limited by her responsibilities to Kragel.[5]   MRPC 1.7(a); MRCP 1.9(a).   In addition, the Court must consider whether Attorney Francis's appearance in this matter could result in the disclosure of confidences gained in the Thomas case.   MRPC 1.6.   Finally, the Court must consider whether Kragel waived his right to move for disqualification, and whether disqualification would prejudice WAPA.

### A.      Whether Plaintiff Waived his Right to Move for Disqualification

Even if Kragel can demonstrate a disqualifying conflict, it is questionable whether he timely sought disqualification.   First, this motion was brought nearly nine months after Attorney Francis entered the case on defendants' behalf.   Second, although Kragel claims to have only learned of the conflict sometime after the August 19, 2022, mediation in this case, when Attorney Griffiths obtained a copy of the JDA from BoltNagi,[6] Kragel obviously knew that he and WAPA were codefendants in the Thomas matter and that he shared information with Attorney Francis in that case.   Whether Kragel was so distraught over his termination that he could not remember actually signing a JDA in the Thomas case, he cannot plausibly claim that he forgot about that lawsuit completely, or how he collaborated and shared information with Attorney Francis to mount a joint defense strategy.   *See* Restatement (Third) of the Law Governing Lawyers § 6 cmt. i ("If a present or former client with knowledge of the conflict fails to take reasonably prompt steps to object or to seek a remedy, disqualification may be precluded.").   Third, Kragel has been

---

[5] The Court will also address Kragel's standing to bring a motion under Rule 1.7(a)(2).

[6] *See supra* note 1.

represented by counsel throughout this matter, and the explanation for the delay is unpersuasive. *See Cubica Grp.*, 2012 WL 5331257, at *4 (finding waiver where plaintiff was represented by counsel and filed motion eight months after learning of potential conflict).   That this motion arose when it did suggests that plaintiff may be using the disqualification motion "as a tactical maneuver."   *Rohm & Haas Co.*, 187 F. Supp. 2d at 229–30.

Additionally, the Court must consider whether disqualification would result in prejudice to defendants.   *Alexander*, 822 F. Supp. at 1115.   The Court finds that requiring defendants to obtain new counsel would cause some prejudice; however, it would not be unduly prejudicial.   This matter has been pending just over a year, and while the parties have filed several motions, discovery is still in the early stages.   Thus, while there would be some delay, disqualification at this juncture would not seriously disrupt the schedule for this litigation.   For the same reasons, disqualification is not likely to result in overly burdensome costs on defendants to obtain new counsel.   Further, if another attorney at Ogletree Deakins could handle this matter, any prejudicial effect would be limited.[7]

While the Court does not necessarily find Kragel's motion timely, or that disqualification would unduly prejudice defendants, the key issue is whether a disqualifying conflict exists. Accordingly, the Court will consider whether Attorney Francis has a disqualifying conflict of interest under the applicable ethical rules.

/ / /

---

[7] *See, e.g.*, *VECC*, 222 F. Supp. 2d at 722 ("Even assuming, *arguendo,* that Attorney Carpenter had indeed received confidences that are material to this matter and is herself disqualified from representing the plaintiffs, imputed disqualification of the Law Offices is not automatic."); D.C. Bar Legal Ethic Comm. Op. 349 (Conflicts of Interest for Lawyers Associated with Screened Lawyers Who Participated in a Joint Defense Group) (2009) (while a lawyer who participates in a JDA "may acquire contractual and fiduciary obligations" to the nonclient members of the group that "can give rise to a personally disqualifying conflict under [DC R RPC] Rule 1.7(b)(4) . . . such conflicts are not automatically imputed to other lawyers in the lawyer's firm"; firm must consider whether the entire firm is bound by the JDA, and, if not, whether other lawyers were exposed to confidential information from the JDA matter).   Here, Kragel does not suggest that the alleged conflict extends to the entire firm.

*Mark Kragel v. VI Water & Power Authority, et al.*,
Civil No. 2021-78
Page 12

**B.      Whether Attorney Francis has a Disqualifying Conflict of Interest**

     1.   <u>Whether There is an Implied Attorney-Client Relationship or Other Duty of Confidentiality Arising Under the JDA</u>

As an initial matter, disqualification in this case turns on whether there is some sort of special relationship between Kragel and Attorney Francis arising under the JDA that creates a disqualifying conflict of interest.[8]

"Courts have consistently viewed the obligations created by joint defense agreements as distinct from those created by actual attorney-client relationships."   *United States v. Stepney*, 246 F. Supp. 2d 1069, 1080 (N.D. Cal. 2003) (collecting cases).   "In particular, an analogy between joint defense agreements and attorney-client relationships in the context of the evidentiary attorney-client privilege does not necessarily hold where the ethical obligations imposed by joint defense agreements are at issue."   *Id.* n.6.   Nevertheless, "[a] lawyer might have obligations to persons who were not the lawyer's clients but about whom information was revealed to the lawyer under circumstances obligating the lawyer not to use or disclose the information."   Restatement (Third) of the Law Governing Lawyers § 132 cmt. g(ii).

Firstly, courts extended the criminal joint-defense privilege to create "a broader one that protects all communications shared within a proper 'community of interest,' whether the context be criminal or civil."   *In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 364 (3d Cir. 2007), *as amended* (Oct. 12, 2007).   This "community-of-interest" or "common-interest" privilege provides

---

[8]  There is no dispute that the JDA contains a "No Joint Representation" provision:

> [N]othing in this Agreement shall be construed as constituting a joint representation agreement or forming an attorney-client relationship between any of the Parties hereto and any attorneys or law firms representing any such Parties, other than as memorialized by a formal retainer agreement. . . . Counsel for one Party shall not be deemed to have acted as counsel for any other Party by virtue of participation in the joint defense of the claims.

[ECF 98-2] ¶ 16.

that when parties "with a common interest in a litigated or nonlitigated matter are represented by separate lawyers and they agree to exchange information concerning the matter, a communication of any such client that otherwise qualifies as privileged . . . that relates to the matter is privileged as against third persons."   Restatement (Third) of the Law Governing Lawyers § 76.   However, "[u]nless the clients have agreed otherwise, a communication . . . is not privileged as between clients . . . in a subsequent adverse proceeding between them."   *Id.*   To qualify as privileged, "[t]he communication must relate to the common interest, which may be either legal, factual, or strategic in character."   *Id.* cmt. e.

Additionally, a lawyer who receives confidential information from a nonclient pursuant to a JDA may owe a duty of confidentiality to the nonclient.   This arises from the lawyer's fiduciary or contractual obligation to the nonclient party, rather than an ethical duty.   *See* ABA Formal Op. 95-395 § B (1995) (a lawyer receives information from nonclient parties to JDAs "pursuant to an undertaking of confidence . . . [and] would almost surely have a fiduciary obligation" to them);[9] D.C. Ethics Op. 349 ("a lawyer who participates in a [JDA] may acquire contractual and fiduciary obligations to the members of the joint defense group");[10] *see also Takeda Pharm. Co. Ltd. v. Zydus Pharms. (USA) Inc.*, 2019 WL 3284673, at *4–5 (D.N.J. June 6, 2019) (finding JDA did not create an implied attorney-client relationship or impose a fiduciary duty—it "merely impose[d] a duty of confidentiality").   In such a situation, the lawyer "is precluded from a later representation adverse to the former sharing person when *information actually shared* by that person with the lawyer or the lawyer's client is *material and relevant* to the later matter."   Restatement (Third) of

---

[9]  The opinion explains that a lawyer does not owe an ethical obligation to nonclient parties to JDAs because "there is simply no provision of the Model Rules imposing such an obligation."   ABA Formal Op. 95-395 § B.

[10]  The Committee reasoned that although "non-client members of a JDA are not 'clients' or 'former clients,' they are 'third parties' to whom an individual attorney may owe an obligation under a [JDA] . . . [which] can give rise to a conflict of interest under Rule 1.7."   D.C. Ethics Op. 349 § B; *compare* ABA MRPC Rule 1.7(a)(2), *with* DC R RPC Rule 1.7(b)(4).

*Mark Kragel v. VI Water & Power Authority, et al.*,
Civil No. 2021-78
Page 14

the Law Governing Lawyers § 132 cmt. g(ii) (emphasis added) ("Such a threatened use of shared

information is inconsistent with the undertaking of confidentiality that is part of such an

arrangement."); *see also* ABA Formal Op. 95-395 (explaining that while there is no ethical bar to

a lawyer taking on a related representation adverse to nonclient parties to a JDA, the lawyer may

have fiduciary obligations to the nonclients that could result in disqualification);[11] D.C. Ethics Op.

349 § B ("Under . . . Rule [1.7], a lawyer's confidentiality responsibilities to a non-client member

of a joint defense group may preclude the lawyer from undertaking a representation adverse to the

member in a substantially related matter that implicates the confidential information.").

Further, while some courts have found that a JDA "may give rise to an implied attorney-

client relationship, such a result is by no means guaranteed." *Heritage Pharms., Inc. v. Glazer*,

2019 WL 9309180, at *4 (D.N.J. Mar. 1, 2019).[12]   To show such a relationship, a party must

establish "(1) that it submitted confidential information to [the lawyer], and (2) that it did so with

the reasonable belief that [the lawyer] was acting as the party's attorney." *Takeda*, 2019 WL

---

[11] The opinion cites a Fifth Circuit decision holding that an attorney should "not be allowed to proceed against a co-defendant of a former client wherein the subject matter of the present controversy is substantially related to the matters in which the attorney was previously involved, and wherein confidential exchanges of information took place between the various co-defendants in preparation of a joint defense." *Wilson P. Abraham Const. Corp. v. Armco Steel Corp.*, 559 F.2d 250, 253 (5th Cir. 1977).   The court found the defendants' argument persuasive "that in a joint defense of a conspiracy charge, the counsel of each defendant is, in effect, the counsel of all for the purposes of invoking the attorney-client privilege in order to shield mutually shared confidences."   *Id.*   The court thus reasoned that an attorney who receives information in the course of a co-defense "breaches his fiduciary duty if he later, in his representation of another client, is able to use this information to the detriment of one of the co-defendants."   *Id.*   The court noted, however, that there was "no presumption that confidential information was exchanged [because] there was no direct attorney-client relationship."   *Id.*   Accordingly, the court was unable to resolve the parties' dispute "without some specific factual findings by the trial judge as to the content of the information . . . exchanged and whether or not the present controversy is substantially related to the prior one."   *Id.*

[12] *See also United States v. Henke*, 222 F.3d 633, 637 (9th Cir. 2000) (finding JDA establishes an implied attorney-client relationship, which may "create a disqualifying conflict where information gained in confidence by an attorney becomes an issue"); *Roosevelt Irr. Dist. v. Salt River Project Agr. Imp. & Power Dist.*, 810 F. Supp. 2d 929, 966 (D. Ariz. 2011) (finding JDAs "give rise to an implied attorney-client relationship, which may include a duty of confidentiality[, and t]his relationship can lead to a disqualifying conflict of interest"); *but see Stepney*, 246 F. Supp. 2d at 1082–83 (noting that "the cases on which the *Henke* court relied to reach its conclusion do not suggest a general duty of loyalty or a full attorney-client relationship between an attorney and all co-defendants who are party to a [JDA]," and finding no cases "recognizing [JDAs] as creating either a true attorney-client relationship or a general duty of loyalty").

3284673, at *3 (citation omitted).   "[T]he relevant question is whether [the party's] belief that it had an attorney-client relationship with [the lawyer] was a reasonable one considering the Agreement's terms." *Id.*   In making this inquiry, "the Court must consider factors bearing on whether it would be objectively reasonable for the party seeking disqualification to believe under the totality of the circumstances that the lawyer in question was acting as its attorney." *Heritage Pharms.*, 2019 WL 9309180, at *4.   Such factors include the "intent of the alleged client and attorney and payment arrangements." *Ellis v. Ethicon, Inc.*, 2005 WL 8179886, at *4 (D.N.J. Oct. 27, 2005) (citation omitted).   For example, in *Takeda*, the court found that the plain terms of an agreement expressly disavowing the creation of an attorney-client relationship "make clear that the parties did not intend an attorney-client relationship, implied or express, to arise."   2019 WL 3284673, at *4.[13, 14]   Thus, the plaintiff's "argument that it nonetheless had a reasonable or objective belief that [the firm] was acting as its attorney—in the face of the Agreement's plain language evidencing the contrary—[wa]s spurious at best." *Id.*

Here, the JDA expressly provides that "sharing of information, communications and work product pursuant to this Agreement shall be covered by the joint defense privilege . . . ." [ECF 98-2] ¶ 1.   The JDA further states that "Joint Defense Materials shall be held in strict confidence

---

[13] There, the JDA stated: "Nothing contained in this Agreement is intended to create any attorney-client relationship among the outside counsel for a Plaintiff, and Plaintiffs which they do not represent in the litigation, for the purposes of conflicts or otherwise." *Takeda*, 2019 WL 3284673, at *3.

[14] The case of *Ford Motor Co. v. Edgewood Properties, Inc.*, 2011 WL 5080347 (D.N.J. Oct. 25, 2011), cited by plaintiff, is distinguishable.   There, the parties entered a Common Litigation Interest Agreement stating that the information shared was "privileged and confidential and subject to the common legal interest privilege." *Id.* n.6.   The court found an implied attorney-client relationship based on "the express nature of the agreement's 'common legal interest privilege' and because of the parties' subsequent sharing of confidential information in precisely the manner contemplated by the agreement." *Id.* at *6.   Although the agreement's final paragraph stated that "[n]othing in this agreement shall be construed to create an attorney-client relationship beyond the existing attorney-client relationships between each Party and its current counsel," the court reasoned that the "'existing attorney-client relationships' include the 'common legal interest privilege' established in paragraph one of the agreement." *Id.* at n.8.   In so finding, however, the *Ford* court conflated two different concepts to negate the final paragraph's effect— an agreement that information will be protected as privileged does not equate to forming an attorney-client relationship between counsel for the codefendants and the third parties—thereby imposing on counsel the broader duties attendant to such a relationship.

by the Parties[,]" *id.* ⁋ 4, and that this obligation continues "even after the termination of the Agreement, the withdrawal or expulsion of any Party, or the termination of the Claims by final judgment, settlement or otherwise." *Id.* ⁋ 6. However, that the parties agreed that the materials are privileged and must be kept confidential does not provide a basis for disqualification in this matter. Rather, it is still Kragel's burden to show that there is some reason why Attorney Francis's receipt of privileged joint defense materials in an unrelated case, which she is contractually obligated to keep confidential, prohibits her representation of WAPA in this case. *See* Restatement (Third) of the Law Governing Lawyers § 132 cmt. g(ii); D.C. Ethics Op. 349 § B; *Wilson*, 559 F.2d at 253. Stated another way, even assuming a duty of confidentiality, how could the information disclosed become an issue in this case? *See id.*; *see also Henke*, 222 F.3d at 637; *Takeda*, 2019 WL 3284673, at \*5 ("Takeda's argument that [firm] is shirking its obligation of confidentiality . . . is premised on an assumption that [firm] could utilize, or has utilized, confidential information which it obtained in the prior litigations against Takeda in the current action. No such showing has been made, however."). Further, as in *Takeda*, there can be no credible argument that Kragel "had a reasonable or objective belief that [Attorney Francis] was acting as [his] attorney—in the face of the Agreement's plain language evidencing the contrary . . . ." *Id.* at \*4.[15]

In sum, the Court declines to find an implied attorney-client relationship arising from the JDA in the Thomas case that would impose a broad duty of confidentiality or loyalty that, in and of itself, would prohibit Attorney Francis from representing a party adverse to Kragel in a separate

---

[15] *See supra* note 8. Additionally, defendants note that plaintiff does not assert that he ever asked Ogletree Deakins to represent him, that he signed any written agreement for the firm to represent him, that he was billed for legal services rendered to him personally. [ECF 98] at 5. Further, Kragel appeared *pro se* in the Thomas case and made his own filings, and Ogletree Deakins made no filings on his behalf. *Id.* at 7; *see Ellis*, 2005 WL 8179886, at \*4 ("court must look at 'the conduct of the parties, the surrounding circumstances, statements made by the lawyer, or some combination of all three'" (citation omitted)).

lawsuit.   Nevertheless, the Court will consider the principles of confidentiality discussed above to determine whether a conflict of interest exists under the applicable rules that may preclude Attorney Francis's representation of WAPA in this matter.

> 2.   <u>Whether the Representation is Conflicting</u>

> > a.   MRPC 1.6

Rule 1.6 "governs the disclosure by a lawyer of information relating to the representation of a client during the lawyer's representation of the client."   MRPC 1.6 cmt. 1; *see also* MRPC 1.8(b) (prohibiting a lawyer from "us[ing] information relating to representation of a client to the disadvantage of the client unless the client gives informed consent").   The D.C. Bar Legal Ethics Committee found that Rule 1.6 does not "create any confidentiality obligations to non-clients that are enforceable through discipline under the Rules."   D.C. Ethics Op. 349 § B.   The Committee reasoned: "The only obligations that Rule 1.6 imposes involve 'a confidence or secret of the lawyer's client.'   A joint defense agreement does not make the parties 'clients' of the participating lawyers.   Indeed the raison d'être for a joint defense agreement is to share privileged information with non-clients."   *Id.*   Thus, if Kragel is not a "client" of Attorney Francis, this rule provides no basis for disqualification.

Regardless of whether Rule 1.6 applies to the case at hand, the JDA requires that "Joint Defense Materials shall be held in strict confidence by the Parties."   [ECF 98-2] ¶ 4.   Further, this obligation continues "even after the termination of the Agreement, the withdrawal or expulsion of any Party, or the termination of the Claims by final judgment, settlement or otherwise."   *Id.* ¶ 6.   Accordingly, while the Court finds no grounds for disqualification under Rule 1.6, by the express terms of the parties' Agreement, Attorney Francis is still obligated to keep confidential the information Kragel disclosed pursuant to the JDA.

/ / /

     b.  MRPC 1.7

     This rule requires the Court to consider whether there is either direct adversity between two or more clients, or a "significant risk of material limitation on the lawyer's advocacy due to the lawyer's relationship with multiple clients," responsibilities to third persons, or personal interests.  *Denero*, 2015 WL 5012126, at \*4; MRPC 1.7.  Here, the Court finds no concurrent conflict of interest under either prong.

     First, there is no direct adversity within the meaning of Rule 1.7(a)(1).  This requires "a conflict as to the legal rights and duties of the clients, not merely conflicting economic interests." ABA Formal Op. 05-434.   In this case, the parties' interests are directly adverse because plaintiff has sued defendants for wrongful termination.  However, Kragel is not a "client."  *See* D.C. Ethics Op. 349 ("members of a joint defense group do not become the lawyer's 'clients' by virtue of such agreements"); *see also* MRPC 1.7 cmt. 6 (an attorney's duty of "[l]oyalty to a current client prohibits undertaking representation directly adverse to that client . . . even when the matters are wholly unrelated[,]" unless the client consents).   To apply this rule in Kragel's favor would result in an untenable outcome by allowing Kragel's interests as a nonclient member of the JDA to trump WAPA's right to retaining its chosen counsel in this matter.   Plaintiff points to no case supporting such an interpretation of the rule.   His claim of direct adversity "by virtue of [Attorney Francis's] position as *de facto* lead counsel and the [JDA] in the Thomas matter and her simultaneous appearance in the instant case" is thus unavailing.   [ECF 78] at 5.

     Second, Kragel has not met his high burden to demonstrate a disqualifying concurrent conflict under Rule 1.7(a)(2).[16]   Here, the inquiry is whether there is a significant risk that

---

[16] Rule 1.7(a)(1) only applies to two or more current clients; thus, if the JDA in the Thomas matter does not give rise to an attorney-client relationship between Kragel and Attorney Francis, the rule affords no basis for disqualification. Rule 1.7(a)(2), however, is broader in scope, and includes a lawyer's responsibilities to "another client, a former client or a third person or by a personal interest of the lawyer."   *See* MRPC 1.7 cmt. 8, cmt. 23 (conflict under Rule 1.7(a)(2) may result when a lawyer represents multiple plaintiffs or defendants in the same suit); MRPC 1.7 cmt. 9 ("In addition to conflicts with other current clients, a lawyer's duties of loyalty and independence may be materially limited by

Attorney Francis's ability to consider, recommend, or carry out an appropriate course of action on

WAPA's behalf will be materially limited by her responsibilities to Kragel as a nonclient party to

the JDA—an argument that is WAPA's, not Kragel's, to make.[17]    *See Tibbott v. N. Cambria Sch.*

*Dist.*, 2017 WL 2570904, at *2–4 (W.D. Pa. June 13, 2017) (noting that "[t]he Third Circuit has

not definitively resolved whether a party who is not a client or former client has standing to seek

opposing counsel's disqualification," and viewpoints differ).    When a nonclient party "seeks

disqualification of opposing counsel [based on] an alleged conflict of interest between opposing

counsel and h[er] client, that party lacks standing unless he can show 'an ethical breach that so

infects the litigation . . . that it impacts the moving party's interest in a just and lawful

determination of h[is] claims.'"    *Nicholas v. Grapetree Shores, Inc.*, 2013 WL 1196960, at *7

(D.V.I. Mar. 22, 2013) (omission in original) (quoting *Prosser v. Nat'l Rural Utilities Co-op. Fin.*

*Corp.*, 2009 WL 1605637, at *3 (D.V.I. June 8, 2009)); *see also Appeal of Infotechnology, Inc.*,

582 A.2d 215, 221 (Del. 1990) (nonclient party has standing to enforce Rule 1.7(a) if he can show

how opposing counsel's conflict prejudiced his rights).    Thus, "[w]hile a [JDA] does impose a

duty of confidentiality, that duty is limited in that the showing required to establish a conflict of

---

responsibilities to former clients under Rule 1.9 or by the lawyer's responsibilities to other persons, such as fiduciary duties . . . .").

[17] In a criminal matter, the Eleventh Circuit noted that when codefendants enter a JDA, there is no duty of loyalty, "and it is therefore improper to conclude that all of the attorneys in the joint defense strategy session represent all of the participating defendants."    *United States v. Almeida*, 341 F.3d 1318, 1323 (11th Cir. 2003).    The court reasoned that in such a situation,

> Any potential conflict of interest arises solely from the fact that when defendant *B* becomes a witness for the state, the attorney for defendant *A* must make sure that the attorney-client privilege is respected and that confidential communications are not revealed.    The mere inability to utilize the privileged communications is not itself a manifestation of a conflict of interest, because no lawyer in the world could utilize those communications.    *Rather, the potential conflict of interest stems from the fact that defendant A's lawyer might be so tongue-tied (due to his fear of revealing the confidential communications made by defendant B) that his representation of defendant A suffers.*

*Id.* at 1323–24 (emphasis added).

interest arising from . . . participation in a [JDA] is significantly higher than that required to make out a conflict based on form[al] representation of a client." *Stepney*, 246 F. Supp. 2d at 1076.

Additionally, assuming Kragel's motion is properly brought under Rule 1.7(a)(2), participation in a JDA in and of itself does not establish a significant risk of material limitation. Rather, "the critical consideration" is whether Attorney Francis actually obtained Kragel's relevant confidential information, and, if so, the likelihood that her possession of that information will significantly interfere with her advocacy on WAPA's behalf. *See Todman*, 2022 WL 3722457 at *4; *Stepney*, 246 F. Supp. 2d at 1080; Restatement (Third) of the Law Governing Lawyers § 135. Plaintiff's vague allegations as to the types of information disclosed[18] and how it might be used to his detriment[19] are insufficient to meet this burden—particularly where the JDA already protects the joint defense materials as privileged and confidential, and thus prevents their disclosure in this matter.[20]   There is no presumption that confidential information relevant to the present matter was shared simply because the parties entered a JDA in an unrelated case.[21]   *See Wilson*, 559 F.2d at 253; *Stepney*, 246 F. Supp. 2d at 1076 (collecting cases).   Moreover, while plaintiff avers that "[t]hroughout the defense of the Thomas case, all attorneys were privy to

---

[18]  Kragel avers that he shared confidential attorney work product with Attorney Francis, and details of his financials, family life, fears, and employment.   [ECF 78-3] at 1; *see also* [ECF 78] at 11 ("Due to her representation in the Thomas matter, Francis possesses much detail about Mark Kragel, his professional experience, his financial information, his family situation, settlement strategy, [and] other legal strategy/theories in the Thomas matter triggering attorney-client and work product privileged information."), and 13–14 (same).

[19]  Kragel contends that without disqualification, he is "vulnerable to a continuing unfair advantage due to Attorney Francis' participation in the shared defense strategy of depositions, the theories of liability to be explored in motion practice, the sharing of confidential and/or privileged information."   [ECF 78] at 18; *see also id.* at 11 ("Simone Francis' participation in the Thomas matter and the instant matter is adverse to Mark Kragel by virtue of her position alone.").

[20]  "Admittedly, there is a significant difference between the disclosure of confidential information and the use of confidential information without disclosure."   *Stepney*, 246 F. Supp. 2d at 1081.

[21]  Nor is this matter substantially related to the Thomas litigation.   *See* discussion *infra* Section III.B.2.c; D.C. Ethics Op. 349 (lawyer's confidentiality responsibilities to nonclient member of JDA "can give rise to a personally disqualifying conflict under Rule [1.7] to the extent that they materially limit the lawyer's ability to prosecute or defend a substantially related matter adverse to a joint defense group member").

*Mark Kragel v. VI Water & Power Authority, et al.,*
Civil No. 2021-78
Page 21

confidential work product and privileged information," plaintiff also states that until the August

19, 2022, mediation in this case, the "Thomas case has been dormant for almost four (4) years."

[ECF 78] at 3.[22]   The Court questions what information, if any, might have been disclosed

pursuant to the JDA prior to this four-year period that would be relevant and material to this case,

where the facts giving rise to plaintiff's claims occurred in June 2020.

In sum, while the Court acknowledges that the JDA precludes Kragel from revealing the

exact communications at issue, it is still his burden to establish with specificity a violation of the

rules.   *Hamilton*, 2009 WL 2026327, at *3; *see also Infotechnology, Inc.*, 582 A.2d at 221

(nonclient party bears burden to prove the existence of a conflict and how it will prejudice the

fairness of the proceedings).   A general supposition that confidences disclosed in an unrelated

matter will operate to his disadvantage is not enough.   *See Nicholas*, 2013 WL 1196960, at *7

("Plaintiff's largely unsupported contention that his chance of receiving a fair settlement or trial

on the merits is diminished simply does not rise to this level.").   Thus, though Kragel contends

disqualification is required to protect the public's interest in the scrupulous administration of

justice, he does little to explain how the alleged conflict will affect his ability to fairly litigate his

case.   *See Tibbott*, 2017 WL 2570904, at *4 (stating that while courts have found nonclient

standing "in certain cases involving glaring conflicts of interest that call into question the fair or

efficient administration of justice, this does not appear to be one of those cases" (internal

quotations and citation omitted)); *Prosser*, 2009 WL 1605637, at *3 (finding "Plaintiffs have not

provided any evidence of any ethical breach, let alone a breach that 'so infects the litigation' that

it would impact Plaintiffs' interest in the determination of its claims").

Accordingly, the Court finds that neither prong of Rule 1.7(a) warrants disqualification.

---

[22] Defendants attach a copy of the Superior Court docket, printed on September 6, 2022, indicating that no filings have been made in the Thomas case since December 17, 2018.   [ECF 98-3].

This case presents neither a directly adverse conflict nor a significant risk that Attorney Francis's

representation of WAPA will be materially limited by any responsibilities she owes to Kragel

pursuant to the JDA that will prejudice the determination of his claims.   Two ongoing litigations

involving some of the same parties and counsel, without more, are not disqualifying under Rule

1.7.  *See Denero*, 2015 WL 5012126, at *7 ("disqualification simply cannot be based on mere

speculation that a chain of events whose occurrence theoretically could lead counsel to act counter

to his client's interests might in fact occur" (citation omitted)); *Heritage Pharms.*, 2019 WL

9309180, at *2 ("surmise alone cannot support an order of disqualification" (citation omitted)); *cf.*

*Takeda*, 2019 WL 3284673, at *5 (disqualification denied where plaintiff moved to disqualify

firm's representation of defendant because firm represented plaintiff's co-plaintiff in a prior case

wherein plaintiff and co-plaintiff entered JDA; plaintiff "made no showing that any of this

confidential information is related to, or can impact, the current litigation").

> c.   MRCP 1.9

Rule 1.9 applies to former clients.[23]   If there is no attorney-client relationship, then there

is no "client" within the meaning of the rule.   Here, as discussed above, Kragel is not a "client"

of Attorney Francis in the traditional sense of the word.   *See* D.C. Ethics Op. 349 ("Joint defense

agreements do not create 'former client' conflicts under Rule 1.9 because members of a joint

defense group do not become the lawyer's 'clients' by virtue of such agreements.").   Further, the

Thomas litigation is ongoing, and the JDA remains in effect.   Thus, Kragel is also not a "former"

client.

Even assuming that some form of attorney-client relationship exists within the meaning of

---

[23] The D.C. Bar Legal Ethics Committee noted that Rule 1.9 only addresses conflicts that involve a "former client"; thus, by its own terms, the rule "creates no obligations with respect to a person . . . who was never a client."   D.C. Ethics Op. 349 § B.   Further, "[c]ase law in the District of Columbia requires a showing 'that an attorney-client relationship formerly existed' in order for the Rule to apply."   *Id.* (citation omitted).   Therefore, "[b]ecause a non-client member of a joint defense group is not a 'client'—and in many cases could not be a client under the applicable conflicts rules—Rule 1.9 does not preclude adversity to non-client joint defense group members."   *Id.*

Rule 1.9,[24] the Court finds that Attorney Francis's representation of defendants in this matter is

not the same or substantially related to Attorney Francis's representation of Kragel in the Thomas

matter.   *See* MRPC 1.9 cmt. 3.

First, there is no dispute that the current case and the Thomas case do not involve the same

transaction or legal dispute.   In the Thomas matter, Attorney Francis provided services in defense

of Thomas's claims of defamation arising from yet another unrelated case.   By comparison, in the

present matter, Attorney Francis represents WAPA against allegations of wrongful termination

and retaliation regarding Kragel's First Amendment rights to free speech and political association.

The cases concern completely different issues and legal theories, and are premised on different

underlying facts occurring at different time periods.   Thus, the nature and scope of the two

lawsuits are wholly unrelated.   Further, as discussed above, Kragel did not hire Attorney Francis

to represent him in the Thomas case.   The defendants in that case entered the JDA to coordinate

sharing of information based on their "joint interests and common defenses **with regard to the**

**claims . . . in connection with the [Thomas] Litigation.**"   [ECF 98-2] ¶ C (emphasis added).

While Attorney Francis may have taken a lead role in responding to discovery requests, deposing

Thomas, or mediation strategy, those services were performed in connection with claims that are

unrelated to the claims in this case.

Second, where matters do not involve the same transaction or legal dispute, the Court must

also consider whether there is a substantial risk that Kragel's confidential information disclosed to

Attorney Francis in the Thomas matter would materially advance WAPA's position in this case.

---

[24] For example, the Court could find that, pursuant to the JDA, there is some duty of confidentiality owed to Kragel. *See* MRPC ANN. r. 1.9(a) annot. (AM. BAR ASS'N 2019) (Common-Interest Agreements) (When lawyers enter a JDA and "agree[] to keep the information of the other lawyers' clients confidential[, t]his obligation may result in disqualifying one of the lawyers from later representing someone adverse to a nonclient member of the group in a substantially related matter.   Rationales, however, vary."); *see also* D.C. Ethics Op. 349 ("a lawyer who participates in a joint defense agreement may acquire contractual and fiduciary obligations to the members of the joint defense group").

*Mark Kragel v. VI Water & Power Authority, et al.*,
Civil No. 2021-78
Page 24

MRPC 1.9 cmt. 3.   In other words, "might [Kragel] have disclosed confidences" to Attorney

Francis that "could be relevant and detrimental to [him in] the present action."   *VECC, Inc.*, 222

F. Supp. 2d at 720; *cf. Smith v. Virgin Islands Water & Power Auth.*, 2007 WL 5794433, at *2

(D.V.I. Dec. 19, 2007) ("The purpose of Rules 1.9 and 1.10 is to prohibit a lawyer from switching

sides and divulging or using information about a client or former client to the advantage of an

adverse party.").   Kragel alleges generally that he "shared confidential information with Attorney

Francis" regarding his financials, family life, fears, and employment.   [ECF 78-3] at 1.   However,

he fails to make any specific argument as to how this information would materially advance

WAPA's position here.   The Court finds that, without delving into the exact nature of confidences

revealed, given the nature and scope of this case and the Thomas case, the information disclosed

is not likely relevant to the issues of whether WAPA wrongfully terminated Kragel for speaking

out on matters of public concern, or failed to follow the proper termination procedures.   *See*

*VECC, Inc.*, 222 F. Supp. 2d at 721; *Com. Ins. Co.*, 808 F. Supp. at 1204; *see also* Restatement

(Third) of the Law Governing Lawyers § 132 cmt. g(ii) ("A lawyer who learns confidential

information from a person represented by another lawyer pursuant to a common-interest sharing

arrangement is precluded from a later representation adverse to the former sharing person *when*

*information actually shared* by that person with the lawyer or the lawyer's client *is material and*

*relevant to the later matter*." (emphasis added)); *cf. Denero*, 2015 WL 5012126, at *4

("Disqualification of a party's chosen counsel is a serious matter which cannot be based on

imagined scenarios of conflict.").   A "substantial risk" requires more than mere conjecture.

For the same reasons, there is no material adversity.[25]   Certainly, Attorney Francis is

---

[25] A recent ABA opinion addresses how to construe "interests [that] are materially adverse," which is not defined in Rule 1.9 or the comments thereto.   ABA Formal Op. 21-497 (2021).   The opinion explains that courts, regulatory authorities, and ethics scholars "have generally concluded that 'material adverseness' includes, but is not limited to, matters where the lawyer is directly adverse on the same or a substantially related matter."   *Id.* § II.   Further:

representing a party here that is adverse to Kragel—Kragel is suing Attorney Francis's client, WAPA.   But "[n]ot every situation involving adverseness constitutes material adverseness." ABA Formal Op. 21-497 § II(B).   While the parties are adverse by virtue of their positions as opposing litigants, there is no *material* adversity because there is no substantial risk that confidential information Attorney Francis may have learned about Kragel in an unrelated case involving different claims and legal theories would materially advance WAPA's position in this case.   *See* MRPC 1.9 cmt. 3; *see also* ABA Formal Op. 21-497 § II ("in the absence of direct adverseness . . . a claimed detriment that is not accompanied by demonstrable harm to the former or prospective client's interests does not constitute 'material adverseness'") and § IV ("'Material adverseness' under Rule 1.9(a) . . . exists where a lawyer is negotiating or litigating against a former or prospective client . . . *in the same or a substantially related matter*." (emphasis added)). On this point, the Court agrees with defendants that "there is no credible cause for concern that Ogletree Deakins' continued representation of WAPA will 'taint' this litigation or prejudice Kragel."   [ECF 98] at 15.

---

> While material adverseness is present when a current client and former client are directly adverse, material adverseness also can be present where direct adverseness is not.
>
> However, "material adverseness" does not reach situations in which the representation of a current client is simply harmful to a former client's economic or financial interests, without some specific tangible direct harm. . . . Material adverseness . . . "requires a conflict as to the legal right and duties of the clients, not merely conflicting or competing economic interests."
> . . .
> Further, in the absence of direct adverseness, generalized financial harm or a claimed detriment that is not accompanied by demonstrable harm to the former or prospective client's interests does not constitute "material adverseness."

*Id.* (citation omitted).   "Generally, whether a former client and current client have materially adverse interests is not a difficult question, as the situation usually involves a new client suing a former client."   *Id.* (citation omitted).   In more complicated situations, however, a court must evaluate "the degree to which the current representation may actually be harmful to the former client."   *Id.* (citation omitted).   "This analysis focuses on 'whether the current representation may cause legal, financial, or other identifiable detriment to the former client.'"   *Id.* (citation omitted). The Committee cautioned that "[s]uch detriment has it limits, otherwise the concept of materiality would have no meaning."   *Id.*

In sum, plaintiff fails to explain how anything Attorney Francis learned about him in the Thomas case is relevant to the claims in this case, or how the confidences revealed could be used against him to materially advance WAPA's position in this matter.   Thus, the argument is more a general allegation that because Kragel shared some of his personal information with Attorney Francis in the Thomas case, it is unfair for her to serve as opposing counsel in this case.   Such broad speculation does not warrant disqualification under Rule 1.9.[26]

## IV.   CONCLUSION

In short, plaintiff has come forward with nothing more than unsupported suppositions of a potential conflict arising from the JDA in the Thomas case.   Disqualification is a drastic measure that should only be imposed when the court proceeding is infected by an ethical violation that compromises the integrity of the judicial process.   Having found that (1) there is no concurrent conflict of interest in this case, and (2) Attorney Francis's current representation of defendants is with respect to a matter that is not the same or substantially related to the Thomas matter, and considering that disqualification is a harsh measure and generally disfavored, the Court concludes that plaintiff has failed to meet his burden in demonstrating that disqualification is required.

Accordingly, for the foregoing reasons, plaintiff's motion is DENIED.   [ECF 78].

**Dated:** December 22, 2022                    S\_____

                                                                     **RUTH MILLER**
                                                                     United States Magistrate Judge

---

[26] The rationale behind the Fifth Circuit's holding that an attorney who receives information in the course of a co-defense "breaches his fiduciary duty if he . . . is able to use this information to the detriment of one of the co-defendants" is based on the reality that the attorney cannot help but later use what he has learned from earlier confidences.  *Wilson*, 559 F.2d at 253.   However, the court also emphasized that disqualification is not warranted unless the attorney "was actually privy to confidential information" because there is no presumption that such information was exchanged, **and** the matters are substantially related.  *Id.*